UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
RIENZI & SONS, INC.,                                    :
                                                        :
                Plaintiff, Counterclaim-Defendant,      :
                                                        :          **OPINION AND ORDER**
                -against-                                :          08-CV-2540 (DLI)(JMA)
                                                        :
N. PUGLISI & F. INDUSTRIA PASTE                         :
ALIMENTARI S.P.A. and FRANCESCO PULEJO,                 :
                                                        :
                Defendants, Counterclaim-Plaintiffs,    :
                                                        :
------------------------------------------------------------------ x
**DORA L. IRIZARRY, United States District Judge:**

On May 27, 2008, Rienzi & Sons, Inc. ("Rienzi") commenced the instant action against

defendants N. Puglisi & F. Industria Paste Alimentari S.p.A. ("Puglisi") and Francesco Pulejo

("Pulejo") (collectively, "Defendants") by filing a summons and complaint in New York State

Supreme Court, Queens County.   (*See* Decl. of Evan Mandel ("Mandel Decl."), Ex. A,

Complaint, Doc. Entry No. 67-4.)  On June 25, 2008, Defendants properly removed the action to

this Court pursuant to 28 U.S.C. §§ 1332 and 1441(a).  (*See* Notice of Removal, Doc. Entry No.

1.)  Defendants filed an answer and asserted a counterclaim against Rienzi for breach of contract.

(*See* Answer, Doc. Entry No. 8.)  Rienzi amended its complaint to assert one claim for breach of

fiduciary duty, three claims for breach of contract, and one claim for breach of joint venture.

(*See* Amended Complaint ("Am. Compl."), Doc. Entry No. 14.)  Defendants' answer to the

Amended Complaint denied Plaintiff's claims and re-asserted Puglisi's counterclaim against

Rienzi for breach of contract.   (*See* Answer to Amended Complaint, Doc. Entry No. 18.)

Defendants amended their answer to include two additional affirmative defenses: failure to

mitigate damages and waiver.  (*See* Amended Answer to Amended Complaint ("Am. Answer"),

Doc. Entry No. 52.)

Defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to: Rienzi's breach of fiduciary duty and breach of joint venture claims, two of Rienzi's breach of contract claims, and Puglisi's counterclaim.  (*See* Puglisi's and Pulejo's Mot. for Summ. J. ("Defs. Mot."), Doc. Entry No. 67.)  Rienzi opposes Defendants' motion.  (*See* Plaintiff's Mem. in Opp. to Defs. Mot. for Summ. J. ("Pl. Mem."), Doc. Entry No. 68.)  For the reasons set forth below, Defendants' motion for summary judgment is granted.

## BACKGROUND

Rienzi is an importer and distributor of Italian foods.  (Plaintiff's Combined Response to Defendants' Statement of Material Facts and Counter-Statement of Additional Material Facts ("Pl. 56.1") ¶ 1, Doc. Entry No. 68-25; Puglisi and Pulejo's Rule 56.1 Statement ("Defs. 56.1") ¶ 1, Doc. Entry No. 67-27.)  Michael A. Rienzi is the founder, President, and owner of Rienzi. (Decl. of Michael Rienzi Dated Aug. 24, 2011 ("M. Rienzi Decl.") ¶¶ 1, 6, Doc. Entry No. 68-1.) Puglisi is an Italian pasta manufacturer.  (Pl. 56.1 ¶ 1; Defs. 56.1 ¶ 1.)  In the early 1970s, Rienzi began purchasing pasta from Puglisi, which he imported and sold in the United States under the Rienzi brand.  (*Id.*)  At that time, Gino Puglisi and the Puglisi family owned and managed Puglisi.  (Pl. 56.1 ¶ 2; Defs. 56.1 ¶ 2.)  In or around 1995, the United States Department of Commerce ("U.S.D.O.C.") launched an investigation into Puglisi and other Italian pasta manufacturers for anti-dumping and/or countervailing customs duties owed on pasta ("U.S.D.O.C. Investigation").  (Am. Compl. ¶ 12; Pl. 56.1 ¶ 102; Defendants' Response to Plaintiff's Statement of Additional Facts ("Defs. Reply 56.1") ¶ 102, Doc. Entry No. 69-7.)  In 2006, Pulejo purchased an equity interest in Puglisi and became its President.  (Pl. 56.1 ¶ 2; Defs. 56.1 ¶ 2.)  Rienzi imported and sold Puglisi pasta until 2007.  (Pl. 56.1 ¶ 89; Defs. Reply 56.1 ¶ 89.)

2

## I.     **The Rienzi-Puglisi Business Relationship**

The parties dispute whether the companies conducted business through oral agreements and course of dealing, or through written contracts.  It is undisputed that the relationship between Rienzi and Puglisi began with a "handshake" and an oral agreement between Michael Rienzi and Gino Puglisi.  (Mandel Decl., Ex. H, Deposition of Michael Rienzi Dated Jan. 28, 2010 ("M. Rienzi Dep. Tr.") at 17:21-19:8; M. Rienzi Decl. ¶ 6.)  Moreover, it is undisputed that the parties described the nature of their relationship in an undated supplemental submission to the U.S.D.O.C. as follows:

> "Maintaining a very close business and personal relationship for over 20 years, Mr. Mike Rienzi and Mr. Gino Puglisi do not conduct business pursuant to contracts.  It has been customary for Mr. Rienzi and Mr. Puglisi (as with many Italian businessmen) to transact business pursuant to oral agreements and assurances. Most business is conducted over the phone or via fax and Mr. Rienzi and his son visit the Milazzo plant frequently to confer with the owners of Puglisi.  Thus, the absence of physical documentation in the form of contracts or detailed agreements setting forth the purchasing, pricing or payment conductions on sales is not unusual.

> * * *

> No price agreements or contracts are in effect between Puglisi and Rienzi."

(Decl. of Elliot G. Sagor ("Sagor Decl."), Ex. 10 at 3-4, Doc. Entry No. 68-2.)

Puglisi disputes that the contractual relationship was based on oral agreements and course of dealing, maintaining instead that agreements between the companies were memorialized in writing.  In support of this contention, Puglisi provided the Court with copies of pasta invoices, a 2007 contract regarding the payment of legal fees for the U.S.D.O.C. investigation, and a 1995 right of first refusal letter between Michael Rienzi and Gino Puglisi.  (Defs. Reply 56.1 ¶¶ 91, 110; *see also* Mandel Decl., Exs. E, G, AA.)  Moreover, Puglisi asserts that there had been a

3

material change in the companies' relationship since the U.S.D.O.C. Investigation submissions in the late 1990s.

Rienzi counters that, in 1971, the companies entered into an exclusive importation and supply arrangement based on an oral agreement and course of dealings under which Rienzi purchased dried pasta exclusively from Puglisi[1] and, although Puglisi sold pasta to other Italian-based distributors, it did not sell pasta to any pasta distributors in the United States other than Rienzi.  (Pl. 56.1 ¶¶ 89-91; M. Rienzi Decl. ¶ 2; *see* Defs. Reply 56.1 ¶¶ 89-90 (denying any such exclusive agreement existed or was ever put in writing).)  In a submission to the U.S.D.O.C. in connection with the U.S.D.O.C. Investigation, Puglisi stated: "Rienzi has been Puglisi's exclusive U.S. customer since 1971.  Puglisi has sold no pasta to any U.S. customer other than Rienzi."  (Sagor Decl., Ex. 8, U.S.D.O.C. Antidumping Questionnaire Dated Nov. 3, 1997 at 7, Doc. Entry No. 68-10.)  A supplemental submission to the U.S.D.O.C. disclosed that:

> "There is no formal exclusivity contract between the parties.  The exclusivity is well understood by Puglisi.  After two decades of doing business together, Puglisi has not sold to other U.S. customers.  Puglisi does not approach potential U.S. customers and does not accept orders from them."

(Sagor Decl., Ex. 10, U.S.D.O.C. Supplemental Questionnaire Response at 4, Doc. Entry No. 68-12.)

Over the years, the companies developed a method of conducting business.  (Pl. 56.1 ¶ 94; Defs. Reply 56.1 ¶ 94.)  Rienzi faxed, emailed, or called Puglisi to place a pasta order, indicating the amount of pasta requested.  (Pl. 56.1 ¶ 95; Defs. Reply 56.1 ¶ 95; M. Rienzi Dep. Tr. 188:7-189:3.)  Puglisi acknowledged the order by either a telephone call or a faxed confirmation letter and then shipped the pasta to Rienzi with a written invoice.  (Pl. 56.1 ¶ 95;

---

[1] Rienzi purchased fresh pasta from a separate pasta manufacturer.  (Sagnor Decl., Ex. 21, Deposition of Joseph Rienzi Dated Jan. 26, 2010 ("J. Rienzi Dep. Tr.") at 149:21-50:7.)

Defs. Reply 56.1 ¶ 95.)  Rienzi then distributed the products to various supermarkets and retail stores for sale to the general public.  (*Id.*)

The parties dispute when the contract for each pasta sale was formed and the time at which payments became due for pasta that was shipped and received.  Rienzi asserts that an oral pasta sales contract was formed when it ordered pasta from Puglisi.  (Pl. 56.1 ¶¶ 144-45.)  Puglisi asserts that each pasta sales contract was formed when it shipped the pasta and concurrently issued a written invoice that served as the written sales contract.  (Defs. Reply 56.1 ¶¶ 94-95.)

Rienzi contends that it had an "open account" with Puglisi and Puglisi did not require Rienzi to make payments within a specific time period.  (M. Rienzi Decl. ¶ 13.)  Michael Rienzi testified that the course of dealings between the two companies was such that Rienzi paid Puglisi for pasta that was shipped and received "when it wanted to."  (M. Rienzi Dep. Tr. at 137:5-11, 139:13-24.)  He further clarified that an "open account" meant, "you pay when you feel like it." (*Id.* at 141:12-15.)  In its submissions to the U.S.D.O.C., Puglisi averred that:

> "[B]ecause of the unique nature of their relationship, Rienzi purchases from Puglisi on an open credit term basis without any fixed payment schedule.  There are no set payment terms and no written agreement exists between the two companies regarding payment or credit.  All invoices to Rienzi are printed with payment terms, "as agreed."  Rienzi pays at his own convenience, with due regard to Puglisi's financial needs.  There is no fixed rule as to when payment will be made."

(Sagor Decl., Ex. 10 at 3, *see also* Ex. 8 at 8.)

Michael Rienzi and Pulejo first discussed the timeliness of payments in November 2006. Puglisi contends that the "pasta invoices at issue in this case provided that payment had to be made within 60 to 90 days."  (Defs. Reply 56.1 ¶ 99.)  Yet, Pulejo acknowledged that, in November 2006, Michael Rienzi indicated he would pay "perhaps more quickly, but [M. Rienzi] didn't say that he would pay . . . in 60 to 90 days."  (Mandel Decl., Ex. J, Deposition of

Francesco Pulejo Dated Jan. 20, 2010 ("Pulejo Dep. Tr.") at 85:9-86:2.)   According to Rienzi, under the "open account" arrangement between the parties, the balance for outstanding pasta payments ranged from 1,000,000,000 to 2,000,000,000 lira.   (Pl. 56.1 ¶ 101; *see* Defs. Reply 56.1 ¶ 101 (acknowledging that at various points in time the outstanding balance was in this range).)

## II.   U.S.D.O.C. Investigation and Legal Fees

In or about 1995, the U.S.D.O.C. launched investigations into anti-dumping and/or countervailing customs duties owed on pasta.   (Am. Compl. ¶ 12; Pl. 56.1 ¶ 102; Defs. Reply 56.1 ¶ 102.)   The investigation focused on whether Puglisi and other Italian pasta manufacturers were exporting products into the United States at prices below the home market value of goods, *i.e.*, dumping product into the United States.   (Pl. 56.1 ¶ 102; Defs. Reply 56.1 ¶ 102.)   The parties agree that it was Rienzi, as importer, who would pay the customs duties at issue.   (Pl. 56.1 ¶ 38; Defs. 56.1 ¶ 38.)   It is disputed which company retained the law firm, Grunfeld, Desiderio, Lebowitz & Silverman LLP ("Grunfeld"), for the purpose of representation in the U.S.D.O.C. Investigation, and whether one or both companies were represented by Grunfeld. (Pl. 56.1 ¶¶ 39, 104; Defs. 56.1 ¶ 39; Defs. Reply 56.1 ¶ 104.)

Nonetheless, the companies agreed that Rienzi, at the outset, would pay the full amount of legal fees, which he did.   (Pl. 56.1 ¶¶ 111-12; Defs. Reply 56.1 ¶¶ 111-12.).   The parties dispute what portion of the fees Puglisi was obligated to reimburse Rienzi.   (Pl. 56.1 ¶¶ 113-14; Defs. Reply 56.1 ¶¶ 113-14.).   On November 27, 2004, Puglisi sent Rienzi a draft, unsigned agreement regarding legal fees.   (Pl. 56.1¶ 40; Defs. 56.1 ¶ 40; Mandel Decl., Ex. M.)   The agreement stated, *inter alia*, that Puglisi agreed to reimburse Rienzi for legal fees in the amount of $1 million U.S. dollars ("U.S.D.") and, in exchange, Rienzi agreed to release Puglisi from any

6

other claims in connection with the legal fees.  (Pl. 56.1 ¶¶ 40-41; Defs. 56.1 ¶¶ 40-41; Mandel Decl., Ex. M.)  In a December 17, 2004 letter, Michael Rienzi responded concerning the draft agreement indicating he was "surprised, unhappy and even a bit offended" at the inclusion of a release in the agreement because "what could be more offensive to ask an old friend for.  How can you imagine that I'd ask you for things that we didn't agree on or reopen questions already settled."  (Pl. 56.1 ¶ 42; Defs. 56.1 ¶ 42; Mandel Decl., Ex. N.)  The parties did not sign the 2004 draft agreement.  (Pl. 56.1 ¶ 43; Defs. 56.1 ¶ 43.)

On or about May 25, 2007, the companies signed a written agreement concerning the legal fees for the U.S.D.O.C. Investigation (the "2007 Agreement").  (Pl. 56.1 ¶ 44; Defs. 56.1 ¶ 44; Mandel Decl., Ex. G.)  The parties dispute who drafted the agreement.  (Defs. 56.1 ¶ 45 (stating it was drafted by Rienzi's lawyer or accountant); Pl. 56.1 ¶ 45 (disputing Defendants' statement and maintaining it was written by a Puglisi accountant with the assistance of a part-time Rienzi accountant).)  The 2007 agreement provided that Rienzi had paid all the Grunfeld legal fees, totaling $2,010,000 U.S.D., and Puglisi agreed to pay Rienzi immediately half of the legal fees by deducting $1,005,000 U.S.D. from the amount Rienzi owed Puglisi for unpaid pasta shipments.  (Pl. 56.1 ¶¶ 46-47; Defs. 56.1 ¶¶ 46-47.)  The agreement also provided that:

> "The amount set forth above must be understood as a proposal for a settlement, through which both parties waive any other and/or additional claims, regarding all the related or resulting financial charges or those which in any case can make reference to the facts stated above and in any case, does not represent any acknowledgment whatsoever of the claims put forth in this regard."

(Pl. 56.1 ¶ 48; Defs. 56.1 ¶ 48.)  The parties dispute whether this provision constituted a release from any further claims related to the U.S.D.O.C. Investigation.  (*Id.*)  On May 2007, Puglisi deducted $1,005,000 U.S.D. from the amount Rienzi owed Puglisi for the specific pasta invoices listed in the 2007 Agreement.  (Pl. 56.1 ¶ 49; Defs. 56.1 ¶ 49; Mandel Decl., Ex. G.)

The parties also dispute whether Puglisi orally agreed to pay the remaining half of the legal fees if the business relationship ended.  (Pl. 56.1 ¶ 130; Defs. Reply 56.1 ¶ 130.)  Rienzi claims that, over time, the parties developed an oral understanding regarding the reimbursement of legal fees, which Rienzi terms the "Payment Offset Agreement."  (Pl. Mem. at 3-4.)  Pursuant to this agreement, Rienzi agreed to advance funds to cover all the Grunfeld legal fees, provided Puglisi repaid him 50% of the legal fees as soon as possible through pasta offsets and the remaining 50% if, and when, the two companies stopped doing business together.  (*Id.*) Furthermore, pursuant to the Payment Offset Agreement, Rienzi was permitted to maintain an "Open Credit Balance" equal to the amount of unreimbursed legal fees.  (Pl. 56.1 ¶ 115.)  Puglisi disputes the existence and terms of this oral understanding and maintains that the agreement always was to split the fees equally and any oral discussions were memorialized in writing in the 2007 Agreement.  (Defs. Reply 56.1 ¶¶ 112-15.)  Lastly, the parties dispute whether the total amount of legal fees Rienzi paid was $2,525,000 or $2,010,000.  (Pl. 56.1 ¶¶ 123, 131; Defs. Reply 56.1 ¶¶ 123, 131.)

### III.   The Rienzi-Puglisi Business Relationship Ends

In 2006, Pulejo acquired an equity interest in Puglisi and later became its President.  (Pl. 56.1 ¶ 3; Defs. 56.1 ¶ 3.)  The Rienzi-Puglisi business relationship began to sour because of the legal fees dispute, allegations of Puglisi shipping short and untimely orders, and Rienzi failing to pay invoices in a timely manner.  (Pl. 56.1 ¶¶ 32-37, 117, 141-47, 156; Defs. 56.1 ¶¶ 32-37; Defs. Reply 56.1 ¶¶ 117, 141-47, 156; Sagor Decl., Ex. 3, Deposition of Antonio Sorrentino Dated May 10, 2010 ("Sorrentino Dep. Tr.") 58:22-61:8.)  In April or May 2007, Antonio Sorrentino, an employee of the Unigrani Group that included Puglisi, and Pulejo traveled to New York to meet with Michael Rienzi to discuss the strained business relationship.  (Sorrentino Dep.

8

Tr. at 6:22-7:6, 58:9-21; Pl. 56.1 ¶ 131.)

The parties dispute when Rienzi's invoices were due and whether Rienzi failed to make timely payments.  Rienzi claimed there was an "open account" relationship and, pursuant to the alleged Payment Offset Agreement, any outstanding invoices should have gone towards the open credit balance representing the unpaid legal fees.  (Pl. 56.1 ¶¶ 115, 124-25.)  Puglisi claimed payment of each invoice was due within sixty or ninety days, depending on the invoice, and no such open credit balance existed.  (Defs. Reply 56.1 ¶¶ 115, 124-25.)

The parties agree that, in January 2008, via email, Rienzi terminated the relationship with Puglisi.  (Pl. 56.1 ¶ 157; Defs. Reply 56.1 ¶ 157.)  Rienzi also requested repayment of the remainder of the legal fees not already offset pursuant to the 2007 Agreement.  (Pl. 56.1 ¶ 158.) The parties agree that Pulejo claimed he was "surprised" by the request and that Puglisi attempted to persuade Rienzi to continue the relationship.  (Pl. 56.1 ¶ 159; Defs. Reply 56.1 ¶ 159.)  Puglisi stopped supplying Rienzi with pasta at the time Rienzi terminated the relationship. (Pl. 56.1 ¶ 160; Defs. Reply 56.1 ¶ 160.)

## DISCUSSION

## I.   <u>Legal Standard</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial."  *McCarthy v. Dun & Bradstreet Corp*., 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotations omitted).  A fact is "material" within the meaning of Rule 56

when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)).  "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).  The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor."  *Anderson*, 477 U.S. at 256.  The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading."  *Ying Jing*

*Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## II.    Governing Law

Rienzi contends that the United Nations Convention on Contracts for the International Sale of Goods ("CISG")[2] governs resolution of this dispute.  (Pl. Mem. at 8-12.)  Defendants dispute this and assert that New York law applies.  (Defendants' Reply Memorandum of Law ("Defs. Reply Mem.") at 2-7, Doc. Entry No. 69.).  It is unnecessary for the Court to delve into whether the alleged contracts at issue in this case are the kinds of contracts subject to the CISG as the history of this litigation is dispositive of this issue.

The Complaint was filed in New York State court and removed to this Court pursuant to diversity jurisdiction, not federal question jurisdiction.  (Notice of Removal, Doc. Entry No. 1.)  Both the Complaint and the Amended Complaint assert claims without citation to the legal authority upon which the claims are based.  In its answer to Defendants' counterclaim, Rienzi asserted, among other affirmative defenses, that the claim was barred by the New York Statute of Frauds.  (Rienzi's Answer to Counterclaim ¶ 23, Doc. Entry No. 11.)  On several occasions, counsel for the parties framed their arguments about the merits of the case in terms of principles recognized under New York law that are not recognized under the CISG.  (Reply Decl. of Evan Mandel ("Mandel Reply Decl.") ¶ 2, Doc. Entry. No. 69.)  In an application seeking permission to file a sur-reply brief, counsel for Rienzi sought to distance himself from these previous

---

[2] "When two foreign nations are signatories to this Convention, as are the United States and Italy, the Convention governs contracts for the sale of goods between parties whose places of business are in these different nations, absent a choice-of-law provision to the contrary."  *Claudia v. Oliviera Footwear Ltd.*, 1998 WL 164824, at *4 (S.D.N.Y. Apr. 7, 1998) (citing CISG, Article 1(1)(a)).

discussions, by stating that he had made references to New York law "by way of argument only and not by way of agreement of the applicable law in the instant case." (Rienzi Application for Sur-reply Brief at 1, Doc. Entry No. 70.) That may have been counsel's intent, but it is curious that during the history of this case, counsel never mentioned the CISG.

Notably, at the pre-trial conference held before the Court, counsel for Rienzi stated: "I think that rather than have confusion, we would apply New York law. I'm comfortable with New York law applying." (Mandel Reply Decl., Ex. Z, Transcript of July 15, 2011 Pre-Trial Conference at 9, Doc. Entry No. 69-4.) Later in that proceeding, defense counsel stated he wanted to "consider Italian law." (*Id.* at 20.) The Court explained that the parties had agreed just minutes earlier that New York law applied and the parties should make a decision and brief the issue, if necessary. (*Id.* at 21.) Until Rienzi's opposition to Defendants' motion for summary judgment, there had been no mention of the CISG at the pre-trial conference or in legal documents exchanged between the parties or submitted to the Court, and there was no evidence it had been discussed between the parties.

The selection of the governing law upon which a plaintiff proceeds is not an ace of spades to be held in counsel's hand until discovery has closed and then sprung on an unsuspecting adversary. *See Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, at *2 (S.D.N.Y. Dec. 2, 2010) (declining to apply the CISG and explaining "[w]hile application of the CISG may have been appropriate, plaintiff by its actions had consented to the application of [New York law] and it was far too late to withdraw that consent without undue prejudice to defendant"). Given that the CISG is mandatory unless the parties expressly opt out, Rienzi had notice of the potential applicability of the CISG at the time it filed the Complaint in New York State court and certainly during the entire litigation in this Court.

Rienzi's express statements to the Court and Defendants regarding its reliance on New York law and its silence as to the CISG demonstrate that Rienzi had consented to the application of New York law.  It would be unduly prejudicial to Defendants to hold otherwise.  Accordingly, the Court holds that New York law, and not the CISG, will govern the resolution of this dispute.

## III.   Analysis

Rienzi asserts five claims:  (1) breach of fiduciary duty against Defendants for delaying and ultimately ceasing pasta shipments ("First Claim"); (2) breach of contract against Puglisi for delaying and ultimately ceasing pasta shipments ("Second Claim"); (3) breach of contract against Puglisi for shipping spoiled pasta products ("Third Claim"); (4) breach of contract against Puglisi for failing to reimburse Rienzi for legal fees that Rienzi advanced Puglisi during the U.S.D.O.C. Investigation ("Fourth Claim"); and (5) breach of joint venture against Puglisi for failing to reimburse those same legal fees ("Fifth Claim").  Puglisi moved for summary judgment on claims One, Two, Four, and Five.  Additionally, Puglisi moved for summary judgment on its counterclaim for breach of contract against Rienzi for unpaid pasta invoices.  Pulejo moved for summary judgment on the only claim asserted against him, Rienzi's First Claim for breach of fiduciary duty.  Based on the parties' submissions, Rienzi's Third Claim is not at issue in Defendants' motion for summary judgment.  Accordingly, this Opinion is limited to the analysis of Rienzi's First, Second, Fourth, and Fifth claims, as well as Puglisi's counterclaim.

### A.   Rienzi's Claims

#### 1.   Breach of Fiduciary Duty

Rienzi asserts a claim for breach of fiduciary duty against Defendants for delaying and ultimately ceasing pasta shipments.  (Am. Compl. ¶¶ 32-43.)  Defendants contend that summary judgment should be granted in their favor on this claim because: (a) Rienzi's claim for breach of fiduciary duty is duplicative of Rienzi's second claim for breach of contract for failure to ship

13

pasta orders timely; and (b) Defendants did not owe a fiduciary duty to Rienzi. (Puglisi's and Pulejo's Mem. of Law in Support of their Motion for Summ. J. ("Defs. Mem.") at 11-13.) Rienzi argues that: (a) its claim for breach of fiduciary duty is not duplicative because the claims rest on different factual allegations and, to the extent there are factual overlaps, it is premature to dismiss the claim; and (b) a fiduciary relationship may exist between a distributor and a manufacturer. (Pl. Mem. at 21-24.)

As a general rule, "a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *Regan v. Conway*, 768 F. Supp. 2d 401, 410-411 (E.D.N.Y. 2011) (citing *William Kaufman Org. Ltd. v. Graham & James LLP*, 269 A.D. 2d 171, 173 (1st Dep't 2000)). "This general rule is derived from the fact that '[u]nder New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.'" *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 2004 WL 1837349, at *4 (S.D.N.Y. Aug. 16, 2004) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F. 3d 73, 80 (2d Cir. 2002)). "As a result, most courts 'faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing [have] dismissed the latter claim as duplicative.'" *Id*. (quoting *Alter v. Bogoricin*, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997)).

"Even if the parties are involved in a contractual relationship, there can be a separate and distinct fiduciary relationship." *Regan*, 768 F. Supp. 2d at 411. In certain rare cases, courts have found a fiduciary duty between distributors and manufacturers where the manufacturer exerted control or domination over the distributor. *Manhattan Motor Cars, Inc. v. Automobile Lamborghini, S.p.A.*, 244 F.R.D. 204, 219-20 (S.D.N.Y. 2007) (finding a duty of confidence arose out of an agreement between an automobile dealership and an automobile manufacturer

14

because the manufacturer had "the authority to exercise near life and death economic power over" the dealership, including requirements that the dealership provide the manufacturer with sales and inventory reports, customer data, and all information concerning the dealership's business); *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y. 2d 369, 370, 376-77 (1957) (finding a fiduciary duty existed between a manufacturer and distributor where the distributor was required to provide the manufacturer with lists of prospective customers, business records, inventory records, and financial reports).

First, Rienzi's allegations for breach of fiduciary duty are nearly identical to those asserted in Rienzi's Second Claim for breach of contract; namely, that by delaying and ultimately ceasing pasta shipments, Defendants damaged Rienzi because it was unable to deliver product for sale in stores.  (*Compare* Am. Compl. ¶¶ 35-40, *with* Am. Compl. ¶¶ 46-49.)

Second, there is no separate and distinct fiduciary relationship between the parties.  The facts of this case are not similar to those rare cases where courts found a fiduciary duty between a distributor and an overbearing manufacturer.  Indeed, Michael Rienzi unequivocally stated that Puglisi did not "control Rienzi in any way."  (M. Rienzi Dep. Tr. at 179:9-13; Pl. 56.1 ¶¶ 62, 69; Defs. 56.1 ¶¶ 62, 69.)   The parties agree that Rienzi was "the dominant player in the relationship."  (Pl. 56.1 ¶ 73; Defs. 56.1 ¶ 73.)  Moreover, Rienzi sold the pasta imported from Puglisi under its own name-brand and not Puglisi's, thereby demonstrating its independence. (M. Rienzi Decl. ¶ 6.)  When asked about a meeting with Pulejo, who had traveled to the United States to reassure Rienzi of its ability to maintain a steady supply, Michael Rienzi stated:  "Mr. Pulejo was more afraid of me that I was not going to buy more product from him, okay.  When you see a person that needs you bad, you can't walk away."  (M. Rienzi Dep. Tr. at 88; Pl. 56.1 ¶ 61.)  Furthermore, the parties agree that Rienzi was not required to provide Puglisi with any

confidential or financial information, customer lists, or marketing strategies, and Puglisi never demanded to review Rienzi's books or records.   (Pl. 56. 1 ¶¶ 70-71; Defs. 56.1 ¶¶ 70-71.) Accordingly, summary judgment is granted in favor of Defendants on Rienzi's breach of fiduciary duty claim.

2.    <u>Breach of Contract Regarding Delayed Pasta Shipments</u>

Rienzi asserts a breach of contract claim against Puglisi for delaying and ultimately ceasing pasta shipments.  (Am. Compl. ¶¶ 44-50.)  The alleged contract at issue comprises oral, individual sales agreements, in which Puglisi allegedly failed to ship as promised pasta Rienzi had ordered – Rienzi collectively terms these the "Unfulfilled Sales Agreements."  (Pl. Mem at 7.)  Puglisi contends summary judgment should be granted in its favor because: (a) no such contract existed; (b) the claim is barred by the Statute of Frauds; and (c) even if the contract existed and is enforceable, Puglisi had a right to withhold performance because Rienzi failed to pay for prior shipments of pasta in a timely manner.  (Defs. Mem at 14-17.)  Rienzi does not maintain that the alleged contract is valid under New York's Statute of Frauds; instead, it argues that the CISG has no Statute of Frauds and there are material facts in dispute regarding the terms of the Unfilled Sales Agreements.  (Pl. Mem. at 8-12.)  Rienzi's Second Claim fails as a matter of law, because assuming, *arguendo*, that the Unfulfilled Sales Agreements existed, the contract is unenforceable under New York's Statute of Frauds.

As explained above, New York law, and not the CISG, governs the resolution of this dispute.  (*See supra* Part II.)  Under New York law, there are four elements necessary to establish a breach of contract claim: (1) the formation of a contract between the parties; (2) performance by the plaintiff; (3) failure to perform on the part of defendant; and (4) damages.  *See Johnson v. Nextel Commc'ns, Inc.*, 660 F. 3d 131, 142 (2d Cir. 2011) (citations omitted).  New York

16

Uniform Commercial Code Section 2-201(1) provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." N.Y. U.C.C. § 2–201(1).

The parties agree that the alleged pasta orders were for pasta "far in excess of $500" and that no written contract existed for these orders.  (Pl. 56.1 ¶¶ 13-14; Defs. 56.1 ¶¶ 13-14.) Therefore, even if the "Unfulfilled Sales Agreements" constituted a binding contract, the contract would be barred by the Statute of Frauds.  *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. App'x 102, 104-05 (2d. Cir. 2012) (finding that a "long-standing overarching contract" to produce whatever goods were ordered and "individual contracts" representing each order violated the statute of frauds when they were for the sale of more than $500 and not in writing).  Accordingly, summary judgment is granted in favor of Puglisi on Rienzi's breach of contract claim for delayed pasta shipments.

### 3. Breach of Contract Regarding Legal Fees

Rienzi asserts a breach of contract claim against Puglisi for failure to repay Rienzi the full amount of legal fees once their relationship ended.  (Am. Compl. ¶¶ 56-62.)  Puglisi contends that summary judgment should be granted because: (a) the alleged agreement did not exist; (b) even if it existed, it is barred by the release in the 2007 Agreement; (c) there was an accord and satisfaction as a matter of law; and (d) the alleged oral agreement is barred by the Statute of Frauds.  (Defs. Mem. at 17-19.)  Rienzi argues against summary judgment contending: (a) the CISG controls the breach of contract claim and the CISG does not have a parole evidence rule; (b) the Payment Offset Agreement is evidence it never intended to release Puglisi from

17

repaying the full amount of legal fees; (c) material facts as to the Payment Offset Agreement are in dispute; and (d) Puglisi's failure to plead accord and satisfaction in the answer waived the defense. (Pl. Mem. at 12-17.) Rienzi's Fourth Claim fails as a matter of law, because the release in the 2007 Agreement is unambiguous and Rienzi is precluded from offering parole evidence to show Rienzi never intended to release Puglisi.

### a. Payment Offset Agreement and the 2007 Agreement

Rienzi's breach of contract claim regarding legal fees is premised on an oral understanding that Rienzi refers to as the "Payment Offset Agreement." (Pl. Mem at 4-5, 13.) Under this oral understanding, Rienzi alleges: (1) Rienzi agreed to advance funds to cover all of the U.S.D.O.C. Investigation legal fees on the condition it would be repaid; and (2) Puglisi agreed to reimburse Rienzi 50% of the legal fees via "pasta offsets" and the remaining 50% when the two companies stopped doing business. (Pl. Mem. at 5; Pl. 56.1 ¶¶ 112,114.) The alleged "pasta offsets" were payments for pasta orders owed by Rienzi, that Puglisi agreed to offset in order to reimburse Rienzi for the legal fees. (*Id.*) The conversations comprising the oral understanding, termed the Payment Offset Agreement, took place prior to the May 25, 2007 signing of the 2007 Agreement. (*Id.* at 5-6.) Puglisi disputes the existence of this oral understanding and maintains that the agreement always was that each company would pay a portion of the legal fees. (Defs. Reply 56.1 ¶¶ 112, 114.)

The 2007 Agreement is a written document signed by both Rienzi and Puglisi. (Mandel Decl., Ex. G; *see also* Pl. 56.1 ¶¶ 44, 46; Defs. 56.1 ¶¶ 44, 46.) The stated purpose of the 2007 Agreement is to address the legal fees issue. (Pl. 56.1 ¶¶ 44, 46; Defs. 56.1 ¶¶ 44, 46.) Furthermore, the 2007 Agreement contains the following language:

> "[W]e are hereby following up on our recent discussions to confirm that Puglisi intends to reimburse Rienzi for a 50% share of the legal fees incurred by Rienzi

equivalent to the amount of $1,005,000 to challenge the initiatives undertaken by the Internal Trade Administration, Department of Commerce, as cited several times above.

The amount set forth above must be understood as a proposal for a settlement, through which both parties waive any other and/or additional claims, regarding all the related or resulting financial charges or those which in any case can make reference to the facts stated above and in any case, does not represent any acknowledgment whatsoever of the claims put forth in this regard."

(Mandel Decl., Ex. G at 1; Pl. ¶ 48; Defs. 56.1 ¶ 48.)  Rienzi does not dispute that the 2007 Agreement contains this language; rather, it disputes that the language serves as a release and argues that the Payment Offset Agreement is evidence that it never intended to release Puglisi from repaying the remaining legal fees.  (Pl. 56.1 ¶ 48; Pl. Mem. at 13-14.)  Rienzi argues it may use the Payment Offset Agreement as extrinsic evidence because the CISG does not have a parole evidence rule.

> b.    *The Release in the 2007 Agreement Is Binding Upon the Parties*

As explained above, New York law, and not the CISG, governs the resolution of this dispute and consequently any interpretation of the 2007 Agreement.  (*See supra* Part II.)  Under New York law, when "a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, . . . the intent of the parties [is] indicated by the language employed.'"  *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F. 2d 1113, 1115 (2d. Cir. 1977) (quoting *German Roman Catholic Orphan Home v. Liberty Nat'l Bank & Trust Co. (In re Schaefer)*, 18 N.Y. 2d 314, 317 (1966)).  Where "the language with respect to the parties' intent is clear and unambiguous, it will be given effect, regardless of one party's claim that he intended something else."  *Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc.*, 23 F. 3d 55, 58 (2d. Cir. 1994).  "Furthermore, a release that is clear on its face will be binding on the parties unless the party seeking to avoid it establishes that it was procured by fraud, duress, undue

influence, or some other illegal means." *K&S Co. v. Sexton Inv. Co.*, 1999 WL 92284, at *5 (S.D.N.Y. Feb. 18, 1999). The release in the 2007 Agreement is clear and unambiguous and there is no evidence to indicate that it was "procured by fraud, duress, undue influence, or some other illegal means." *Id.* Accordingly, Rienzi is bound by the release.

c.      *The Parole Evidence Rule Applies*

"One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given." *Meinrath v. Singer Co.*, 482 F. Supp. 457, 460 (S.D.N.Y. 1979), *aff'd without op.*, 697 F. 2d 293 (2d Cir. 1982). Even if the alleged "Payment Offset Agreement" existed, Rienzi cannot offer it as parole evidence to show Rienzi never intended to release Puglisi.

Generally, when parties have reduced their agreement to writing, "the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Trans-Pro Logistic Inc. v. Coby Electronics Corp.*, 2012 WL 526764, at *8 (E.D.N.Y. Feb. 16, 2012) (internal quotations and citations omitted). "In order to establish that the parol evidence rule applies to a particular contract, the party opposing the admission of parol evidence must demonstrate that (1) the final, written, contract is an integrated agreement, (2) the language of the written contract is clear and unambiguous, and (3) there has been a breach of the contract." *Morgan Stanley High Yield Secs, Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 213 (S.D.N.Y. 2003) (citing *Investors Ins. Co. v. Dorinco Reinsurance Co.*, 917 F. 2d 100, 103-05 (2d Cir. 1990)).

First, the Court must determine whether the 2007 Agreement is an integrated agreement. Under New York law, a contract that appears to be complete on its face is an integrated

agreement as a matter of law. *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000). If the written document "appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement then it constitutes the contract between them, and is presumed to contain the whole of that contract." *Id.* If the contract, like the one at issue here, lacks an express integration clause, the district court must, "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." *Starter Corp. v. Converse, Inc.*, 170 F. 3d 286, 295 (2d. Cir. 1999) (internal quotation marks omitted). In making this determination, New York courts look at: "whether the document in question refers to an extrinsic oral agreement, whether the parties were represented by counsel when they negotiated the written agreement, whether these negotiations occurred over a lengthy period, whether the condition at issue is fundamental, and whether the agreement contains formal language . . . declaring that the agreement reflects a mutual understanding." *Trans-Pro Logistic Inc.*, 2012 WL 526764, at *8.

The 2007 Agreement begins by explicitly providing "[t]he following is hereby agreed and stipulated between the parties." (Mandel Decl., Ex. G at 1.) It then clearly sets forth the facts of the U.S.D.O.C. Investigation and the Grunfeld legal fees, the outcome of the Investigation for both parties, and creates obligations on both parties. (*Id.*) The 2007 Agreement references prior discussions regarding legal fees for the U.S.D.O.C. Investigation and explicitly provides that the signed agreement is intended as a confirmation to follow up on those discussions. (*Id.*) As the stated purpose of the agreement is to settle the issue of legal fees, the release clause is fundamental to the agreement. (*Id.*) Furthermore, the agreement was signed by sophisticated businessmen with ready access to counsel. Therefore, the 2007 Agreement is an integrated

agreement.

Next, the Court must determine whether the terms in the 2007 Agreement are unclear or ambiguous. The "traditional view is that the search for ambiguity must be conducted within the four corners of the writing." *Adler & Shaykin v. Wachner*, 721 F. Supp. 472, 476 (S.D.N.Y. 1988). The release clause provides that Puglisi will reimburse Rienzi for 50% of the legal fees and the parties waive any further claims arising from the U.S.D.O.C. Investigation. Rienzi asserts that the 2007 Agreement is ambiguous on its face, because: (1) the use of the word "settlement" can have two possible meanings; and (2) the reference to some, but not all, of the Grunfeld retainers is ambiguous. (Pl. Mem. at 16.) The Court rejects Rienzi's arguments and finds that the 2007 Agreement is indeed clear and unambiguous.

Rienzi argues that the word "settlement" in the 2007 Agreement release clause could mean a "settlement of account" and not a "legal settlement" to preclude future claims. It is unequivocally clear that the release clause is intended as a legal settlement, most evidently because the sentence clause following the word "settlement" states that "both parties waive any other and/or additional claims . . . ." (*See* Mandel Decl., Ex. G at 1.)

Moreover, the Court rejects Rienzi's argument that the 2007 Agreement is ambiguous as to whether future payments for legal fees over the stated amount of $2,010,000 and not listed by invoice number in the agreement are foreclosed by the release. A straight forward reading of the agreement demonstrates there is no ambiguity. In the recitation of the facts, the 2007 Agreement states that "the fees for the legal assistance provided by [Grunfeld], in the amount of $2,010,000 were paid in various installments by Rienzi." (Mandel Decl., Ex. G at 1.) The 2007 Agreement then provides: "Puglisi intends to reimburse Rienzi for a 50% share of the legal fees incurred by Rienzi equivalent to the amount of $1,005,000 . . . ." (*Id.*) The legal invoices listed as part of the

22

2007 Agreement constitute only 50% of the legal fees (the portion Puglisi agreed to reimburse, totaling $1,005,000) and were never meant to be a complete list of all legal invoices from Grunfeld. (Mandel Decl., Ex. G at 4.)

While Rienzi asserts that the 2007 Agreement "did not resolve how any other legal payments over $2,005,000 [sic] . . . were to be reimbursed," the 2007 agreement explicitly does so through the release clause. (*See* Pl. Mem. at 13.) The release clause clearly provides that "both parties waive any other and/or additional claims, regarding all the related or resulting financial charges or those which in any case can make reference to the facts stated above. . . ." The statement of facts is an explanation of the U.S.D.O.C. Investigation and, thus, there is no ambiguity about what has been waived. Furthermore, nowhere in the agreement does it suggest conditions under which Puglisi must repay the remaining legal fees.

Lastly, Rienzi breached the 2007 Agreement's release clause by bringing the instant action, which includes a breach of contract claim for legal fees related to the U.S.D.O.C. Investigation.

Therefore, the parole evidence rule applies and use of the Payment Offset Agreement as extrinsic evidence to show Rienzi never intended to release Puglisi is barred. Moreover, any issues of fact as to the Payment Offset Agreement are immaterial, because introduction of said agreement is barred. Thus, the release clause in the 2007 Agreement bars the breach of contract claim regarding legal fees as a matter of law. Accordingly, summary judgment is granted in favor of Puglisi on Rienzi's breach of contract claim for unpaid legal fees.

### 4.   Breach of Joint Venture

Rienzi asserts a breach of joint venture claim against Puglisi for failing to reimburse it for the remaining half of the U.S.D.O.C. Investigation legal fees that Rienzi paid. (Am. Compl. ¶¶

63-70.)  The joint venture allegedly was entered into in or about 1995, pursuant to which Rienzi agreed to advance Puglisi legal fees for the U.S.D.O.C. Investigation, provided Puglisi reimbursed the full amount of legal fees if the relationship ended.  (*Id.*)  The alleged joint venture is essentially the oral understanding Rienzi terms the "Pasta Offset Agreement," discussed in Part III.A.3., *supra*.  Rienzi claims that Puglisi breached the joint venture when it failed to reimburse the remaining legal fees once the business relationship ended.  (*Id.*)  Puglisi contends that summary judgment should be granted in its favor because: (1) there was no joint venture, and (2) even if there was, Rienzi is not entitled to any remedy.  (Defs. Mem. at 20-22.)

At the outset, as discussed in Part III.A.3, *supra*, the release in the 2007 Agreement bars this claim.  The release precludes Rienzi from seeking payment of additional legal fees not set forth in the release.  However, even if the release did not bar the claim, Rienzi's joint venture claim fails, because no joint venture existed as a matter of law.

Under New York law, a joint venture is formed when: (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses.  *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F. 3d 329, 341 (2d Cir. 2004) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 909 F. 2d 698, 701 (2d Cir. 1990)).  The absence of any one element "is fatal to the establishment of a joint venture."  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).  At least three elements are lacking in this case: intent, joint control, and sharing of profits and losses.

        *a.*    *Intent*

Rienzi has failed to put forth any evidence that Puglisi intended to enter into a joint

venture and Puglisi has testified to the contrary.  (*See* Pulejo Decl. ¶ 3; Defs. Reply 56.1 ¶¶ 104-05.)  The requirement that there be a specific agreement of intent to form a joint venture is "crucial because 'a joint venture is a voluntary relationship . . . .  This manifestation of intent need not be explicit, but the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 348 (S.D.N.Y. 2001) (internal quotations omitted).   The parties agree that there is no written agreement of joint venture and that no document refers to the parties as having formed a joint venture.  (Pl. 56.1 ¶¶ 50-51; Defs. 56.1 ¶¶ 50-51.)  Rienzi nevertheless contends the joint venture was created through the Payment Offset Agreement, the goal of which was to resolve the U.S.D.O.C. Investigation.  (Pl. Mem. at 18, 20.)  While a joint venture agreement need not be in writing, Rienzi does not point to any acts or other indication of intent from which a reasonable jury could determine Puglisi intended to enter into a joint venture.  Indeed, with respect to a determination of the parties' intent, "[t]he ultimate inquiry . . . is whether the parties have so joined their property, interests, skills, and risks [that] their contributions have become one and their commingled properties and interests have been made subject to each of the others' actions, on the trust and inducement that each would act for their joint benefit." *Zeising*, 152 F. Supp. 2d at 348 (citations omitted).

b.    *Agreement to Share Profits or Losses*

Rienzi also has failed to show any evidence of, and the record provides no basis to establish, an agreement of shared profits or losses.  "An indispensable essential" of a joint venture "is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Ammirato v. Duraclean Int'l, Inc.*, 2011 WL 2730918, at *11 (E.D.N.Y. July 13, 2011) (citing *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.

3d 64, 68 (2d Cir. 2003) (internal quotations omitted); *see also Zeising*, 152 F. Supp. 2d at 348-49 ("If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did not create a joint venture.") (citing *Natuzzi v. Rabady*, 177 A.D. 2d 620, 622 (2d Dep't. 1991)).

Rienzi claims the joint venture was formed when Rienzi and Puglisi both became clients of Grunfeld and agreed to share information, combine resources, and share the cost of legal fees for the U.S.D.O.C. Investigation pursuant to the Payment Offset Agreement.  (Pl. Mem. at 19.) Rienzi argues that a sharing of benefits under the joint venture is demonstrated because both companies were:

> "motivated by a desire to successfully resolve the USDOC issue in their companies' favor, which would keep the duty rate on Puglisi's pasta as low as possible and ensure the continued relationship of the two businesses.  That is, Rienzi would benefit from the continuing delivery of Puglisi pasta – pasta that his customers enjoyed – and Puglisi would continue to benefit from its pasta sales in the U.S. market."

(Pl. 56.1 ¶ 107 (citing M. Rienzi Decl. ¶ 23).)  While this is evidence that each company had an interest in continuing the ongoing manufacture-distributor relationship, it is not evidence that there was an agreement to share benefits resulting from a separate joint venture.  Instead, all it shows is that each company would continue to benefit from its position in the ongoing manufacturer-distributor relationship.  Analyzing the evidence in the light most favorable to the nonmovant, Rienzi has failed to provide any evidence suggesting an agreement between the companies to share any profits or benefits arising from the U.S.D.O.C. Investigation. Furthermore, Michael Rienzi stated in his deposition that the alleged joint venture agreement did not provide for a sharing of any profits.  (M. Rienzi Dep. at 177:3-7.)

Rienzi also fails to show an agreement of shared losses.  Rienzi maintains that, if the defense of the investigation was unsuccessful, the duty rate could increase and there would be

"negative financial consequences" for both companies.  (Pl. 56.1 ¶ 108.)  Rienzi does not provide any indication that this increased duty rate would be shared between the companies; instead, the record is clear that Rienzi was responsible for paying all customs duties.  (Pl. 56.1 ¶ 38; Defs. 56.1 ¶ 38 (citing M. Rienzi Dep. Tr. at 280:6-18.)  Furthermore, Rienzi does not show any shared "negative financial consequences," other than the payment of legal fees to Grunfeld.  (Pl. 56.1 ¶ 108 ("[The parties] realized that if the attorneys were not successful in resolving the USDOC issues . . . . [t]hey would [] have paid for legal fees to Grunfeld which had done the companies no good.").)  The basis of the joint venture advanced by Rienzi is the Payment Offset Agreement, under which Puglisi must pay all the legal fees if, and when, the relationship between the two parties was severed.  Rienzi cannot, on the one hand, claim that the legal fees are a shared loss to prove a joint venture agreement and, on the other hand, claim that Puglisi is required to reimburse Rienzi in full for those legal fees under the same joint venture agreement.  (*See* Pl. Mem. at 20 ("There is no reason that Rienzi would compromise on the payment of legal fees that were Puglisi's obligation to pay as the supplier-exporter in a dumping investigation.").)

Rienzi cites *Liss v. Manuel*, 58 Misc. 2d 614, 618 (N.Y. City Civ. Ct. 1968), to support its contention that a joint venture that requires one party to bear the full loss is an enforceable joint venture agreement.  (*See* Pl. Mem. at 19-20.)  The facts in *Liss* are inapposite to this case.  Not only was there a written and signed joint venture agreement in *Liss*, but that agreement explicitly provided a formula for the sharing of profits and losses, even if that formula was that one party was to bear all the losses.  *Liss*, 58 Misc. 2d at 618.  While "the sharing of profits and losses does not have to be precisely equal, 'it is not enough that the parties have agreed together to act in concert to achieve some stated economic objective.'"  *Ammirato*, 2011 WL 2730918, at *11 (quoting *Steinbeck v. Gerosa*, 4 N.Y. 2d 302, 317-18 (1958)).  Rienzi has not pointed to, nor

does the record support, any sharing of profits and losses outside the preexisting manufacturer-distributor arrangement.

### c.    *Joint Control*

The record provides no basis to establish there was joint control over the alleged joint venture.  Rienzi claims there is evidence of joint control, because of a "practical understanding" that the parties would reach a consensus in decisions related to the U.S.D.O.C. Investigation and legal fees, which is evidence of "a relationship of trust and confidence."  (Pl. Mem. at 19; Pl. 56.1 ¶ 104.)  However, Rienzi neither alleges any specific facts nor points to any evidence in the record tending to prove joint decision making or control.  On the contrary, by maintaining that the Payment Offset Agreement, and not the 2007 Agreement, governs the sharing of legal fees (a premise on which Rienzi's Fourth and Fifth causes of action are based), Rienzi demonstrates the parties did *not* come to any mutual understanding as to the legal fees, the centerpiece of the alleged joint venture.  Moreover, Michael Rienzi stated in his deposition that, during the time period of the alleged joint venture, the parties did not control each other in any way, nor did they hold themselves out as a joint venture.  (M. Rienzi Dep. Tr. at 179:9-13, 185:3-6.)

Analyzing the facts in the light most favorable to the nonmovant, there is no indication of an intent to form a joint venture, joint control, or the existence of an agreement to share profits or losses.  While Rienzi maintains there is a genuine issue of material fact as to the existence of the alleged joint venture agreement, it has not pointed to any material facts, disputed or undisputed, that suggest a joint venture existed.  Based on these deficiencies, Rienzi's claim for breach of joint venture fails as a matter of law.  Accordingly, summary judgment is granted in favor of Puglisi on Rienzi's breach of joint venture claim.

**B.      Puglisi's Breach of Contract Counterclaim**

Puglisi asserts one counterclaim for breach of contract premised on pasta orders that Rienzi failed to pay for.  (Am. Answer. ¶¶ 13-20.)  Puglisi alleges that, at the time Rienzi terminated the relationship, Rienzi owed Puglisi €898,410.06 for pasta it purchased and received from Puglisi.  (*Id.*; Defs. 56.1 ¶ 86.)  Puglisi contends the Court should grant summary judgment in its favor on its counterclaim, because, under New York law, there are no material facts in dispute related to the elements of the contract claim.  (Defs. Mem. at 24-25.)  Rienzi argues Puglisi is not entitled to summary judgment on its counterclaim because: (1) the CISG controls Puglisi's counterclaim, and (2) there are disputed facts as to the existence of the Payment Offset Agreement.

As explained above, New York law, and not the CISG, governs the resolution of this dispute, including Puglisi's counterclaim for breach of contract.  (*See supra* Part II.)  Under New York law, the four elements necessary to establish a breach of contract claim are: (1) the formation of a contract between the parties; (2) performance by the plaintiff; (3) failure to perform on the part of defendant; and (4) damages.  *See Johnson*, 660 F. 3d at 142 (internal citations omitted).  In support of its counterclaim for breach of contract, Puglisi submitted the outstanding pasta invoices, along with a table summarizing the invoices, and Rienzi's Accounts Payable statement showing that Rienzi owes Puglisi at least €898,410.06.  (Mandel Decl., Exs. E-F, T.)  Rienzi does not dispute there was an open balance for unpaid pasta in the amount of at least €898,410.06 and never objected to the invoices of the unpaid pasta at issue.  (Pl. 56.1 ¶¶ 26, 87; Defs. 56.1 ¶¶ 26, 87.)  Therefore, each written invoice, along with Rienzi's acceptance of the pasta, constituted a contract of pasta sale and Puglisi performed under the contract by delivering the pasta.

The Court examines the facts in the light most favorable to Rienzi, as the nonmoving party.  Rienzi argues that it did not pay for the pasta because the open balance was subject to set-offs for the remaining half of the U.S.D.O.C. legal fees, pursuant to the Payment Offset Agreement.  (Pl. 56.1 ¶ 87.)  However, as set forth in Part III.A.3, *supra*, the Court holds that the release in the 2007 Agreement bars claims related to the Payment Offset Agreement as a matter of law, since the subject of that agreement is the repayment of additional U.S.D.O.C. legal fees. Therefore, any disputed facts related to the Payment Offset Agreement are immaterial to the counterclaim.   It is undisputed that Rienzi failed to pay for pasta that Puglisi shipped and invoiced and that Rienzi accepted.  Therefore, Rienzi breached the pasta sale contracts at issue as a matter of law.   Accordingly, summary judgment is granted in favor of Puglisi on its counterclaim for breach of contract.

**CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is granted in favor of Puglisi on Rienzi's claims for breach of fiduciary duty (First Claim), breach of contract for delaying and ultimately ceasing pasta shipments (Second Claim), breach of contract for failing to reimburse legal fees (Fourth Claim), and breach of joint venture (Fifth Claim).   In addition, summary judgment is granted in favor of Puglisi on its counterclaim and in favor of Pulejo on Rienzi's claim for breach of fiduciary duty (First Claim).   As such, Claims One, Two, Four, and Five are dismissed.   This case shall proceed on Claim Three and Puglisi's Counterclaim.

SO ORDERED.

DATED:  Brooklyn, New York
        May 16, 2013


_____/s/_____
DORA L. IRIZARRY
United States District Judge